Gena L. Sluga, 018633
gsluga@cdslawfirm.com
Daniel B. Bernardone, 033256
dbernardone@cdslawfirm.com
CHRISTIAN DICHTER & SLUGA, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Certain Underwriters at Lloyd's, London, Subscribing to Policy Numbers W175C5160201, W175C5170301, and W175C5180401,<br><br>Plaintiffs,<br><br>vs.<br><br>Community Provider of Enrichment Services, Inc., an Arizona corporation; Southwest Fiduciary, Inc., in its capacity as Personal Representative of the Estate of Jeffrey Loveless,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiffs Certain Underwriting Members of Lloyd's, London, Subscribing to Policy Numbers W175C5160201, W175C5170301, AND W175C5180401 (altogether, "Underwriters"), by and through undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 for the

purpose of declaring the rights and legal relations of Underwriters arising from various claims-made-and-reported insurance policies issued by Underwriters to Defendant Community Provider of Enrichment Services, Inc. ("CPES") and for the purpose of determining questions of actual controversy between the parties (including Underwriters, CPES, and Southwest Fiduciary Inc.) relating to how those insurance policies apply, if at all, to CPES's requests for insurance coverage thereunder and to the claims alleged in the action styled *Southwest Fiduciary, Inc. v. Community Provider of Enrichment Services, Inc., et al.*, CV2018-000097.

## **PARTIES**

2.      Underwriters herein includes two syndicates, Syndicate 623 and Syndicate 2623. For the purposes of citizenship, the relevant entities are: with respect to Syndicate 623, Beazley Staff Underwriting Ltd, a company incorporated in England and Wales, on behalf of itself and the other members of Syndicate 623, none of whom are citizens of the United States of America; with respect to Syndicate 2623, Beazley Underwriting Ltd, a company incorporated in England and Wales, which is the sole member of Syndicate 2623. Both Beazley Staff Underwriting Ltd and Beazley Underwriting Ltd are managed by Beazley Furlonge Ltd, authorized as a managing agent at Lloyd's, a company incorporated in England and Wales.

3.      CPES is a corporation organized and existing under the laws of Arizona, with its principal place of business in Tucson, Arizona.

4.      Upon information and belief, Southwest Fiduciary, Inc. ("Southwest") is the legal and personal representative of the Estate of Jeffrey Loveless. Decedent Jeffrey Loveless was an Arizona resident and citizen at the time of his death; accordingly, Southwest is deemed a citizen of Arizona pursuant to 28 U.S.C. § 1332(c)(2).

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. This is an insurance coverage dispute arising from an underlying lawsuit known as *Southwest Fiduciary, Inc. v. Community Provider of Enrichment Services, Inc., et al.*, CV2018-000097 (the "Underlying Lawsuit"). In that action, Plaintiff Southwest is pursuing wrongful death claims pursuant to A.R.S. §§ 14-3110, 46-455(B) and (P), and seeks damages that, if covered, would exceed $75,000.

6.      Venue is appropriate in the District of Arizona under 28 U.S.C. § 1391(b)(1), 1391(c)(2), and 1391(b)(2) because CPES resides in the state of Arizona for venue purposes, Southwest—the entity suing on behalf of the Estate of Jeffrey Loveless—is a resident of Arizona for venue purposes, Arizona is the judicial district in which both Defendants CPES and Southwest reside, and Arizona is also the judicial district in which a substantial part of the evens or omissions giving rise to the claim occurred because a CPES facility in Arizona is the setting where the alleged negligence occurred.

## FACTS COMMON TO ALL CLAIMS

**The Underwriters' Policies**

7.      Underwriters issued the following policies to CPES: policy number W175C5160201 for the policy period of January 1, 2016 to January 1, 2017 (the "2016 Excess Policy"); policy number W175C5170301 for the policy period of January 1, 2017 to January 1, 2018 (the "2017 Excess Policy"); and policy number W175C5180401 for the policy period of January 1, 2018 to January 1, 2019 (the "2018 Excess Policy") (altogether, the "Excess Policies").

A true and correct copy of the Excess Policies are attached hereto as Exhibit A, Exhibit B, and Exhibit C, respectively by chronological order.

8.      The Excess Policies incorporate some of the terms and conditions of the Underlying primary polices, providing excess coverage for claims that trigger coverage under a particular primary policy:

EXCESS INSURANCE POLICY

In consideration of the payment of the premium, in reliance on all statements made in the application, and subject to all of the provisions of this Policy, the Underwriters and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

I. INSURING CLAUSES
>    To pay on behalf of the **Insured** excess of the **Underlying Policies** any claim or loss which triggers coverage under the **Underlying Policies**, and is not otherwise excluded by the terms, conditions or endorsements of this policy, and which is reported to Underwriters in accordance with Clause VI. of this Policy.

9. The "Underlying Policies" referenced in the Excess Policies' insuring clause are set forth in the Excess Policies' Schedule of Underlying Insurance. Specifically, the 2017 Excess Policy states:

**SCHEDULE OF UNDERLYING INSURANCE**
**EXCESS INSURANCE POLICY**

Type of Insurance: PL/GL/EBL/Auto/EL
Primary Policies:

Professional Liability/General Liability (Occurrence)/Employee Benefits Liability

| Insurer: | Hiscox |
|---|---|
| Policy No.: | MEO1309669.17 |
| Limit of Liability: | $1,000,000/$2,000,000 Professional Liability $1,000,000/$2,000,000 General Liability (Occurrence) $1,000,000/$1,000,000 Employee Benefits Liability |
| Deductible: | $ 100,000 – Professional Liability/General Liability $ 1,000 – Employee Benefits Liability |

10. Upon information and belief, the Underlying Lawsuit states a professional liability claim that is being defended by Hiscox under the 2017 professional liability policy MEO1309669.17 referenced above (the "Underlying Hiscox Policy").

11. Each of the Excess Policies includes the following prefatory comment regarding claims-made-and-reported coverage that is afforded by the Excess Policies:

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS OR LOSS DISCOVERED DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM OR LOSS IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMITS OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY DEFENSE COSTS OR FOR ANY JUDGMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

* * *

12.   The Excess Polices include, among others, the following relevant defined terms:

II.    DEFINITIONS

The following terms whenever used in this Policy in boldface type shall have the meanings indicated.

* * *

"**UNDERLYING POLICIES**" shall mean all policies identified in the Schedule of Underlying Insurance.

13. The Excess Policies include the following endorsement that sets forth in clear and unambiguous terms the Underwriters' requirements with respect to the reporting of claims and potential claims. It states, in relevant part:

All claims first made during the **Policy Period** and circumstances that might lead to a claim reported under the **Primary Policy** must be reported to the

Underwriters in writing via the entity named in Item 5. of the Declarations before the end of the **Policy Period** or any additional claims reporting period granted by the **Primary Policy** provided such additional claims reporting period is no greater than thirty (30) days. However, the **Insured** must provide immediate written notice to the Underwriters via the entity named in Item 5 of the Declarations of any claim made against the **Insured** where the **Insured** or the **Insured's** defense counsel evaluates the potential liability of all claims plus costs and expenses incurred in the defense or settlement of such claims at an amount equal to or greater than fifty percent (50%) of the **Underlying Policy Limits**. Notice to any underlying carrier is not notice to the Underwriters.

14.     The entity named in Item 5. of the Declarations of the Excess Policies is: Beazley USA Services, Inc., 30 Batterson Park Road, Farmington, CT 06032 with "Tel: (860) 677-3700" and "Fax: (860) 679-0247." The Excess Policies explain the way in which notice is to be provided to Beazley USA Services, Inc. in the following item:

Item 5. **Notification under this Policy:**

| a. Notification pursuant to Clause VI shall be given to: | b. All other notices under this Policy shall be given to: |
|---|---|
| Beazley USA Services, Inc.<br>30 Batterson Park Road<br>Farmington, CT 06032<br>Tel: (860) 677-3700<br>Fax: (860) 679-0247 | Beazley USA Services, Inc.<br>30 Batterson Park Road<br>Farmington, CT 06032<br>Tel: (860) 677-3700<br>Fax: (860) 679-0247 |

15.     The Excess Policies also include the following endorsement that unambiguously precludes coverage for claims that were known to the Insured, but not disclosed to Underwriters, at the inception of a policy period. It states, in relevant part:

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this policy shall not apply to loss or damages in connection with or resulting from any claim or circumstance:

1. arising out of any circumstance or occurrence which has been notified to the Insurer on any other policy of insurance effected prior to the inception of this Policy;

2. arising out of any circumstance or occurrence known to the Insured prior to the inception of this Policy and not disclosed to the Insurer at inception.

16.     Pursuant to the policy language quoted above, the Excess Policies are claims-made-and-reported excess policies; the impact of this language is that Underwriters must provide coverage in excess of an underlying policy where a claim has been made a reported as required under each Excess Policies' language and coverage exists under each respective Excess Policies' terms.

**The Underlying Hiscox Policy**

17.     The Underlying Hiscox Policy under which CPES currently is being defended includes, among other things, the following conditions and notice requirements:

**IX. Conditions**

A. **Reporting of Claims**: In the event a **Claim** is first made against any **Insured**, the **Insured**, as a condition precedent to any right to coverage under this Policy, shall:
  1. give written notice which shall include any and all documents, including every demand, notice, summons or other applicable information received by the **Insured** or by the **Insured's** representatives, to the representative of Underwriters set forth in Item 6. Of the Declarations of any such **Claim** as soon as practicable;
  2. provide immediate notice in writing to the representative of Underwriters set forth in Item 6. Of the Declarations of receipt of any summons, arbitration demand, or notice of any legal, quasi-legal, or other adjudicatory or adversarial proceeding

If the Insured has the right to either accept or reject the arbitration of any Claim, the Insured shall exercise such right only with the written consent of Underwriters

B. **Notice of Potential Claims**: If, during the **Policy Period** an **Insured** first becomes aware of a **Wrongful Act** to which Section I of this Policy applies, and which **Wrongful Act** might subsequently give rise to a **Claim**, the **Insured** may give written notice to Underwriters of a potential **Claim**

during the **Policy Period**. Such notice must include:

1. the identity of the potential claimant;
2. the identity of the person(s) who allegedly committed or was responsible for the **Wrongful Act**;
3. the date of the alleged **Wrongful Act**;
4. the injury or damage which has or may result from such **Wrongful Act**; and
5. any written notice from the potential claimant describing the **Wrongful Act**.

**The Underlying Lawsuit**

18.     Southwest is the personal representative for the estate of Jeffrey Loveless ("Loveless").

19.     Southwest filed the Underlying Lawsuit on January 10, 2018.

20.     In the Underlying Lawsuit, Southwest alleges that CPES was employed to provide care for Loveless—who allegedly met statutory definitions for vulnerable adult and seriously mentally ill—at a group home; Southwest further alleges that CPES caused Loveless's death through negligence, gross negligence, recklessness, and other tortious conduct in the hiring, training, supervision, and retention of the directors, officers, employees, agents, and contractors whose conduct gave rise to the Underlying Lawsuit.

21.     According to Southwest's allegations in the Underlying Lawsuit, CPES should be held liable for not properly assisting Loveless when Loveless showed signs of medical distress on Friday, September 9, 2016 and Saturday, September 10, 2016.

22.     According to Southwest's allegations in the Underlying Lawsuit, Loveless remained in need of constant medical care from September 10, 2016 until his death on May 27, 2017. Southwest seeks damages against CPES in the form of special, general, and punitive damages.

**Reporting History**

23.     Upon information and believe, CPES notified Hiscox of a potential loss regarding Mr. Loveless on October 26, 2016. On that date, Hiscox received an incident report with respect to Loveless's medical situation and resulting hospitalization.

24.     Although CPES provided Hiscox with appropriate notice of a circumstance that might lead to a claim, CPES did not provide the requisite notice to Underwriters in the manner required by the Excess Policies at any time during the 2016 Excess Policy's policy period (January 1, 2016 to January 1, 2017).

25.     Upon information and belief, CPES received a letter of representation from attorney Douglas Shook on December 8, 2017, stating that Mr. Shook represented the Loveless Estate with respect negligence claim against CPES for Loveless's death.

26.     Although CPES reported the claim to Hiscox, it did not provide the requisite notice to Underwriters in the manner required by the Excess Policies at any time during the 2017 Excess Policy's policy period (January 1, 2017 to January 1, 2018).

27.     Upon information and belief, CPES was served with the Complaint in the Underlying Lawsuit on January 18, 2018.

28. Upon information and belief, CPES reported the suit to Hiscox at that time; Hiscox is handling this claim, however, under the Underlying Hiscox Policy in effect in 2017 when CPES first learned of attorney Shook's representation of the Loveless Estate.

29. It was not until March 5, 2018 that Underwriters received notice of the Underlying Lawsuit—a year and a half after the incident involving Mr. Loveless that CPES reasonably understood might lead to a claim.

## **COUNT I—DECLARATORY RELIEF**

1

2       30.     A justiciable dispute and actual controversy regarding the respective rights and

3   obligations of Underwriters, CPES, and Southwest under the Excess Policies presently exists.

4   Underwriters contend that there is no coverage under the Excess Policies for any claims relating

5   to Loveless's death, including those asserted in the Underlying Lawsuit, and thus, Underwriters

6

7   have no duty to defend or indemnify CPES with respect to the full extent of the claims Southwest

8   alleges in the Underlying Lawsuit under each Excess Policies' terms.

9       31.     Declaratory judgment is both necessary and proper to set forth and determine the

10  rights and obligations of Underwriters, CPES, and Southwest under the Excess Policies and to

11

12  avoid future disputes between the parties.

13                                  **PRAYER FOR RELIEF**

14      WHEREFORE, Underwriters pray for the following relief:

15

16      A.      A judicial declaration that there is no coverage under any of the Excess Policies for

17  damages sought in the Underlying Lawsuit or the death of Loveless;

18      B.      A judicial declaration that Underwriters owe no past or present duty to defend,

19

20  indemnify, or reimburse CPES or Southwest in any amount for any claims in connection with the

21  Underlying Lawsuit or the death of Loveless;

22      C.      An award of reasonable attorneys' fees and costs incurred in this declaratory judgment

23  action; and

24      D.      For such other and further relief as this Court may deem just and proper.

25

26

27

28

RESPECTFULLY SUBMITTED this <u>12th</u> day of October 2018.

CHRISTIAN DICHTER & SLUGA, P.C.

By: <u>/s/ Genal L. Sluga</u>
Gena L. Sluga
gsluga@cdslawfirm.com
Daniel B. Bernardone
dbernardone@cdslawfirm.com
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2018 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing.

<u>/s/ Yvonne Canez</u>